## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **8:22CR140** |
| **vs.** | |
| **DONNALE C. CLAY,** | **FINDINGS AND RECOMMENDATION** |
| **Defendant.** | |

This matter is before the Court on the Motion to Suppress Statements and Request for Hearing (Filing No. 22) filed by Defendant, Donnale C. Clay. Defendant filed a brief (Filing No. 23) in support of the motion and the government filed a brief (Filing No. 26) in opposition.

The Court held a pre-hearing status conference with counsel on September 16, 2022, and held an evidentiary hearing on the motion on October 27, 2022. Defendant was present with his attorney, Richard McWilliams. The government was represented by Special Assistant United States Attorney, Joseph P. Meyer, and Assistant United States Attorney, Crystal C. Correa. The Court received into evidence, without objection, the government's Exhibits 1-8, and Defendant's exhibits 101-119, without objection. Christian Perry Iten (SA Iten), a Special Agent with the Drug Enforcement Administration (DEA), and Nicholas Jaworski (TFO Jaworski), a Nebraska State Patrol trooper and task force officer assigned to the DEA, testified at the hearing. A transcript (TR.) of the hearing was prepared and filed on November 22, 2022. (Filing No. 36). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

## BACKGROUND

In the early morning hours on April 27, 2022, six members of a DEA Task Force Group, including SA Iten[1] and TFO Jaworski,[2] were conducting interdiction at the Trailways Bus Station

---

[1] SA Iten is currently assigned to DEA Task Force Group Two, a commercial interdiction unit that works at commercial package sorting facilities, as well at bus and train stations and airports. SA Iten attended Jetway Training to learn how to identify suspicious packages possibly containing weapons or drugs at mass transit facilities. (TR. 8-9).

[2] TFO Jaworski has been a trooper with the Nebraska State Patrol for 21-years and has been an investigator assigned as a task force officer with the DEA for four years. TFO Jaworski has receive training through the DEA on basic narcotics investigations, and also attended training through the International Narcotics Investigators [sic]

in downtown Omaha, Nebraska. TFO Jaworski was dressed in plain clothes, wearing regular pants, a hooded sweatshirt, and a football cap containing a body worn camera. He was armed but his weapon was not visible, and he did not have visible identification that he was law enforcement. (TR. 64-65). SA Iten similarly was dressed in plain clothes, wearing tennis shoes, jeans, and a gray hoodie, and was also armed with a concealed weapon and did not have visible identification that he was a DEA agent. (TR. 25-26).

SA Iten testified that he has been involved in approximately 30-40 narcotics seizures at this particular Omaha bus terminal, and is fairly familiar with the operations of the bus company that operates in the terminal. SA Iten testified there are two "classes" of luggage: (1) luggage that is stored in overhead compartments or is carried inside the bus with passengers, and (2) larger bags stored underneath the bus. (TR. 13-14). SA Iten testified that luggage stored underneath the bus is not handled the same way as checked baggage in an airport. SA Iten testified that any time the bus stops at the terminal, the doors to the luggage under the bus are opened by the bus company. Although the Omaha bus terminal employs a baggage handler, anyone in the general public can and do access luggage underneath the bus during the time buses are stopped. (TR. 15-16).

SA Iten testified that two buses are scheduled to arrive during the early morning hours when the task force is operating at the bus station: one from Kansas City, Missouri at 5:45 a.m. and another from Denver, Colorado at 5:53 a.m. The bus from Denver is then scheduled to leave Omaha at 6:10 a.m. for Des Moines, Iowa. SA Iten testified that when a bus arrives in Omaha, all passengers must exit the bus for approximately 10-15 minutes, or as long as 35 minutes, while the bus drivers complete a CDL change. (TR. 16-17). When a bus stops in Omaha, the baggage handler will sort through bags underneath the bus to take off those bags that will be transferred to a different bus. On busier days, the baggage handler will sometimes remove bags that are not being transferred while sorting through luggage to find bags that are being transferred. SA Iten testified there are too many variables to firmly state how many bags come off the bus during the stop in Omaha, but he estimated about 50% of the bags—regardless of whether they will be transferred—will come off the bus on average. (TR. 18-19). SA Iten testified task force agents will sometimes remove suspicious luggage, but will also remove bags that are not suspicious to

---

Association regarding trends and topics related to hotel, motel, bus, airport, train interdiction, parcel interdiction, and in-service training. (TR. 63-64).

dig back further into the bus to reach other bags. SA Iten testified that task force agents also handled baggage as "de facto baggage handlers" during COVID when the bus station furloughed their baggage handler. (TR. 20). However, there is no formal agreement between the bus companies and the task force providing the task force with permission to sort through the luggage hold of the buses. (TR. 79).

On April 27, 2022, after the bus arrived from Denver, Colorado around 5:55 a.m., TFO Jaworski and SA Iten began looking through the luggage underneath the bus to identify bags possibly transporting illegal items, and took interest in two pieces of luggage. (TR. 21). TFO Jaworski took note of a newer looking suitcase that had a plastic fastener still attached, as if the price tag was recently removed. The suitcase had a tag with St. Paul, MN as its destination, the name "D. Clay," and a phone number. (TR. 66-67; Ex. 5-6). SA Iten testified that, in his training and experience, brand-new hard-sided bags are the "preferred method for transporting narcotics," and officers are trained to look for indicators of new bags such as tags and wheels with little or no scuff marks. (TR. 12-13). TFO Jaworski testified he removed the suitcase from the bus's luggage hold and placed it approximately three to five feet away on the pavement for two reasons: he noticed the luggage was destined for St. Paul so he believed the bag might be transferred to a different bus, and he wanted to make contact with the individual that claimed the suitcase. TFO Jaworski estimated he handled the suitcase for about five seconds to pull it off the bus and place it on the ground. TFO Jaworski then stepped away from the suitcase and stood back against the wall nearby to watch if anyone came to retrieve the suitcase. (TR. 67-69).

Shortly thereafter, TFO Jaworski activated his body camera when he observed Defendant approach the suitcase. (Ex. 1). TFO Jaworski approached Defendant and asked, "Excuse me, sir, is this your bag?" TFO presented his badge and identified himself as an investigator with the state patrol, and told Defendant was not under arrest or in trouble. (TR. 70-71). TFO Jaworski was not blocking Defendant's path to the bus terminal or exit. (TR. 102). SA Iten stood nearby TFO Jaworski and Defendant, but did not approach them. (TR. 25-26; Ex. 4). TFO Jaworski asked Defendant about his travel plans; Defendant initially stated he was traveling from Minneapolis but then said he was coming from Tacoma, Iowa. TFO Jaworski replied, "You haven't been through Iowa yet," and then Defendant said, "Tacoma, Washington." (TR. 71-72). TFO Jaworski testified Defendant seemed confused or nervous, but there was no indication Defendant was intoxicated or had been using drugs. (TR. 94-95). Defendant indicated he was

traveling to Minnesota to see family, but hesitated before answering he would be there for seven days. Defendant stated he had not yet made his return plans. At TFO Jaworski's request, Defendant produced his bus ticket and itinerary. These travel documents showed Defendant's trip originated in Spokane, Washington, and he had a one-way ticket to St. Paul. Defendant had purchased the ticket two days prior, which TFO Jaworski considers last-minute travel. (TR. 72-73, 101-102; Ex. 7-8). TFO Jaworski also considers Washington to be a "source" state for drugs. (TR. 81). TFO Jaworski returned the ticket to Defendant and asked for permission to search the suitcase. Defendant nodded his head and responded affirmatively. TFO Jaworski placed the suitcase flat on the ground and began unzipping it; Defendant initially bent down towards the suitcase and then immediately took off running. (TR. 73-74; Ex. 1 at 2:45-3:06).

TFO Jaworski alerted the other task force officers that there was a "runner" and also attempted to run after Defendant with the suitcase, which was still partially unzipped. Some items began falling out of the suitcase, so TFO Jaworski stopped to put them back in, and in doing so felt the outline of a handgun in a soft cloth-like material. (TR. 74-75). Other task force officers tackled Defendant, breaking his leg in the process. TFO Jaworski caught up to the other task force officers and advised them he found a handgun in the suitcase. A subsequent search of the suitcase recovered a three handguns; a search of the backpack Defendant was wearing recovered methamphetamine and fentanyl pills; and a search of Defendant's person recovered marijuana and fake fentanyl pills. (TR. 75).

Defendant has filed the instant motion to suppress all evidence and statements obtained from his contact with law enforcement at the bus station. Defendant argues his suitcase was unlawfully seized without reasonable suspicion and that task force officers meaningfully interfered with his possessory interest when they removed the suitcase from underneath the bus. Defendant also contends the initial contact with task force officers was a non-consensual detention without reasonable suspicion. Defendant further argues he did not provide lawful consent to search his suitcase because it was provided during the non-consensual detention. Finally, Defendant argues he was unlawfully seized when he was tackled by law enforcement after he ran away from them. (Filing No. 23; TR. 4).[3]

---

[3] Defendant also moves to suppress any statements he made after he was tackled and handcuffed. (Filing No. 23 at pp. 7-8). The United States agrees that statements made after Defendant was tackled to the ground should not be admitted against him and will not seek to admit any of those statements in its case in chief at trial. (Filing

# ANALYSIS

## I.    Removal of Defendant's Suitcase from the Bus

Defendant first contends TFO Jaworski's removal of his suitcase from the bus's luggage hold amounted to a Fourth Amendment seizure without reasonable suspicion.

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" *United States v. Green*, 9 F.4th 682, 688 (8th Cir. 2021) (citing *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003)).  "[A] seizure occurs when law enforcement 'meaningful[ly] interfere[s] with an individual's possessory interests in property[.]'" *Id.* (quoting *United States v. Va Lerie*, 424 F.3d 694, 706 (8th Cir. 2005) (en banc)).  "[T]he meaningful-interference requirement means that 'not every governmental interference with a person's property constitutes a seizure of that property under the Constitution.'"  *Id.*  Instead, "the [meaningful-interference] seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property." *Id.* (quoting *Va Lerie*, 424 F.3d at 702).  There are "three factors courts should focus on when considering whether detaining a package constitutes a seizure: (1) whether it delayed a passenger's travel or significantly impacted the passenger's freedom of movement; (2) whether it delayed the package's timely delivery; and (3) whether it deprived the carrier of custody of the item." *Id.* (quoting *Va Lerie*, 424 F.3d at 707).  "If none of these factors is satisfied, then no Fourth Amendment seizure has occurred. Conversely, if even a single factor is satisfied, then a Fourth Amendment seizure has occurred." *Id.* (quoting *Va Lerie*, 424 F.3d at 707).  "A law enforcement officer must have reasonable suspicion that a piece of mail, or a package shipped via a commercial carrier, contains contraband to lawfully seize it for investigative purposes." *Id.* (quoting *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004).

First, the undersigned magistrate judge finds that TFO Jaworski did not have reasonable suspicion sufficient under the Fourth Amendment to seize the suitcase.  As testified by TFO Jaworski and SA Iten, the only thing suspicious about the suitcase was that it looked new, and narcotics are often transported in new luggage.  But, the fact that a bus passenger is traveling with a new piece of luggage, standing alone, does not establish the requisite reasonable suspicion

---

No. 26 at p. 1; TR. 4-5).  Based upon the representation of the government, the undersigned magistrate judge will recommend denying Defendant's motion to suppress as to his statements as moot.

supporting a seizure under the Fourth Amendment. Therefore, the Court must determine whether Defendant's suitcase was actually "seized" by TFO Jaworski when he removed it from the bus's luggage compartment, analyzing the three factors set forth in *Va Lerie*. If it was, a Fourth Amendment violation occurred.

In this case, the first two *Va Lerie* factors are clearly not satisfied. TFO Jaworski handled Defendant's suitcase for mere seconds—just enough time to lift the suitcase out of the already-opened luggage compartment to place it on the pavement three to five feet away from the luggage compartment. TFO Jaworski then stepped away from the suitcase to observe whether anyone came to claim it. Moments later, Defendant was freely able to walk up to his suitcase to claim possession of it. Additionally, as SA Iten testified, the bus company requires all passengers to disembark during the stop in Omaha for 10-15 minutes, or as long as 35 minutes, while the drivers complete their CDL change. According to Defendant's travel documents, his final destination was not Omaha, as he was continuing his trip by bus to St. Paul. TFO Jaworski's movement of the suitcase did not delay Defendant's travel or delay the luggage's timely delivery, as neither bus at the station had yet reboarded to depart from the Omaha, and Defendant was able to approach and take possession of his luggage. Under these circumstances, TFO Jaworski's very limited interference with the suitcase did not delay Defendant's travel nor impact his freedom of movement, nor delay the timely delivery of the suitcase to its destination. See *Va Lerie*, 424 F.3d at 707.

The undersigned magistrate judge also finds that the third *Va Lerie* factor—whether TFO Jaworski's actions deprived the carrier of custody of the suitcase—was not satisfied. In discussing this third factor, the Eighth Circuit Court of Appeals has stated this question "turns more on *whose direction* law enforcement followed, rather than *where* the package was briefly taken." *Green*, 9 F.4th at 689. (emphasis in original). "[W]hen officers are acting at the carrier's direction and complying with its guidance, a seizure is not likely to have occurred." *Id*. For example, in *United States v. Alvarez-Manzo*, the Eighth Circuit "concluded that officers acted outside the carrier's direction by moving a bag from the [bus's] luggage compartment to the passenger compartment" because "the officer, 'not [the bus company], was directing the action with respect to [the passenger]'s bag." *Green*, 9 F.4th at 689 (quoting *United States v. Alvarez-Manzo* 570 F.3d 1070, 1076-77 (8th Cir. 2009)). As such, "the holding in *Alvarez-Manzo* 'did not turn on where law enforcement took the bag but at whose direction law enforcement acted

when it did so.'" *Green*, 9 F.4th at 689 (quoting *Alvarez-Manzo* 570 F.3d at 1076). "The carrier's 'direction' in *Va Lerie* was limited to general designations about where to bring the luggage after the officer had identified it as suspicious." *Green*, 9 F.4th at 689 (concluding a detective did not deprive FedEx of custody of a box by removing it from the conveyor belt and walking it 200 feet to the back of the facility because the detective was acting at FedEx's direction).

The above discussion of the third *Va Lerie* factor presents a problem for the government in this case because the record is clear that TFO Jaworski moved Defendant's suitcase on his own for purposes of the task force's drug interdiction efforts, with no direction from the carrier. Nevertheless, the undersigned magistrate judge still finds TFO Jaworski's handling of Defendant's suitcase did not deprive the carrier of its custody. In *United States v. Zacher*, 465 F.3d 336, 338 (8th Cir. 2006), the Eighth Circuit held that no seizure of a shipped package occurred when an officer placed the package on the floor of a FedEx facility to conduct a canine sniff. 465 F.3d at 339. The Eighth Circuit reasoned that, although the officer handled the package, "[n]o change in custody occurred when [the detective] placed the package on the floor, since a reasonable person could expect FedEx to handle his or her package the same way." *Id.* The Eighth Circuit in *Zacher* focused on "the sender's reasonable expectations of how the carrier would handle the package" and said that those expectations "define[d] the scope of the carrier's custody." *Id.* (citing *Va Lerie*, 424 F.3d at 707 n.7). "From *Zacher*, we know that an officer moving and handling a package does not automatically constitute a seizure." *Green*, 9 F.4th at 689. And, as observed by the Eighth Circuit in *Va Lerie*:

> [A] commercial bus passenger who checks his luggage should reasonably expect his luggage to endure a fair amount of handling-if his luggage were not handled, it would not reach its destination. For instance, a commercial bus passenger's checked luggage must be sorted, loaded, rearranged, possibly transferred to another bus, and unloaded. The luggage may be damaged and require removal from the luggage compartment. If a bus breaks down, a passenger should expect his luggage to be removed from the luggage compartment and either transferred to another bus or taken inside the bus terminal. As long as law enforcement officers do not deprive the commercial carrier of its custody of the checked luggage, no meaningful interference with the passenger's checked luggage occurs.

424 F.3d at 706-07.

Here, although TFO Jaworski did not move Defendant's suitcase at the bus carrier's direction, the undersigned magistrate judge finds TFO Jaworski's brief movement of the suitcase

did not deprive the bus carrier of custody because a reasonable person would expect the bus carrier to handle the suitcase the same way. See *Zacher*, 465 F.3d at 339. SA Iten testified he is familiar with how bus carriers handle luggage at the Omaha bus station. SA Iten testified that any time a bus stops, the doors to the luggage stored underneath the bus are opened by the bus carrier. Although the Omaha bus terminal employs a baggage handler, anyone in the general public can and do access luggage underneath the bus during the stop. During the stop, the bus's baggage handler will sort through these bags to remove those that will be transferred to a different bus. Sometimes the baggage handler will also remove bags that do not need to be transferred while sorting through luggage to find bags that are being transferred. While SA Iten testified that there are a number of variables at play, he estimated about 50% of the bags stored under the bus will come off during the bus stop, regardless of whether the bag will be transferred. Here, TFO Jaworski's brief movement of Defendant's suitcase was no different than how the bus carrier regularly handles luggage during the Omaha stop: he simply picked up the suitcase from the already-opened luggage compartment, placed the suitcase on the pavement next to the bus, and walked away. The undersigned finds this minimal movement of Defendant's suitcase did not deprive the carrier of custody of the suitcase. As such, the third *Va Lerie* factor is also not satisfied.

Because none of the three *Va Lerie* factors apply to TFO Jaworski's movement of Defendant's suitcase, the undersigned magistrate judge finds Defendant's suitcase was not seized, as TFO Jaworski did not meaningfully interfere with Defendant's possessory interest in the suitcase. Therefore, no Fourth Amendment violation occurred.

## II.    TFO Jaworski's Initial Encounter with Defendant

Defendant also argues he was detained without reasonable suspicion during his initial encounter with TFO Jaworski. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); see also *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to

search luggage--provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201 (citing *Bostick*, 501 U.S. at 434-35).

The undersigned magistrate judge finds TFO Jaworski's initial encounter with Defendant was consensual and was not a detention. TFO Jaworski had positioned himself a short distance away from the suitcase to watch for an individual to claim it. When he saw Defendant approach the suitcase, TFO Jaworski, in plain clothes with his firearm concealed, walked up to Defendant and asked, "Excuse me, sir, is this your bag?" TFO presented his badge and identified himself as an investigator with the state patrol, and told Defendant he was not under arrest or in trouble. TFO Jaworski was not blocking Defendant's path to the bus terminal or exit. TFO Jaworski spoke to Defendant alone; SA Iten, also wearing plain clothes with his weapon concealed, stood nearby but did not approach them, and the other task force officers were not in close proximity. TFO Jaworski spoke in conversational and not threatening or intimidating tone and used no "physical force or show of authority" to restrain Defendant's liberty or block his path, *Terry v. Ohio*, 392 U.S. 1, 20 (1968), and "the tone of the entire exchange was cooperative," *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996). Under these circumstances, a reasonable person in Defendant's position would have felt free to leave. Therefore, the undersigned magistrate judge finds this was a consensual encounter and not a detention. See, e.g., *Drayton*, 536 U.S. at 204 (finding no detention when "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of [the bus] exits, no threat, no command, not even an authoritative tone of voice."). TFO Jaworski asked Defendant questions about his itinerary and travel plans, and asked for permission to search his bags, all of which are permissible during a consensual encounter. See *id.* at 201.

### III.    Consent to Search Suitcase

Defendant also challenges the validity of his consent to search the suitcase. To establish voluntary consent to a search, "the Government must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 895 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). An individual voluntarily consents to a search if, by his or her words and conduct, he or she causes a "reasonable person to believe" the individual "has knowingly and voluntarily consented, whether or not the person actually intends to

consent." *Cedano-Medina*, 366 F.3d at 684-85. Courts "analyze several factors in determining whether consent was given voluntarily, taking into account the totality of the circumstances." *Garcia-Garcia*, 957 F.3d at 896 (citing *United States v. Correa*, 641 F.3d 961, 966-67 (8th Cir. 2011). Those factors include the defendant's

> age, education, intelligence, sobriety, and experience with the law; and . . . context . . ., such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . ., and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Id.* at 896-897 (quoting *Correa*, 641 F.3d at 966-67). "The factors should not be applied mechanically, and no single factor is dispositive or controlling." *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) (citation omitted).

Here, considering the totality of the circumstances, Defendant's words and conduct would cause a reasonable person to believe he knowingly and voluntarily consented to the search of his suitcase. TFO Jaworski's encounter with Defendant occurred in a public place and lasted less than three minutes. TFO Jaworski approached Defendant alone, and Defendant was cooperative and agreed to speak to him. TFO Jaworski did not make any promises or misrepresentations, brandish his weapon, or touch, physically intimate, or threaten Defendant. Defendant was not restrained or prevented from leaving. Defendant is 38-years old and has significant criminal history, including three felony convictions one being a drug trafficking conviction. TFO Jaworski testified Defendant seemed confused or nervous, but there was no indication Defendant was intoxicated or had been using drugs. Under the totality of the circumstances, the undersigned magistrate judge finds Defendant's consent to search the suitcase was voluntary.

## IV.    Seizure after Defendant Fled

Defendant also asserts that he was tackled by law enforcement without reasonable suspicion. "[A]n initially consensual encounter can ripen into a seizure requiring reasonable suspicion or probable cause." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). "As a consensual encounter progresses, a police officer may act in some way to restrain a person's liberty and prevent her from walking away." *United States v. Estrella Moreno*, No. 8:18CR258, 2019 WL 1792302, at *3 (D. Neb. Apr. 24, 2019), aff'd sub nom. *United States v. Moreno*, 988 F.3d 1027 (8th Cir. 2021)(citing *Campbell*, 843 F.2d at 1092). The Fourth

Amendment permits brief investigative stops when law enforcement has a particularized and objective basis for suspecting the person stopped is, or is about to be, engaged in criminal activity. See *United States v. Cortez*, 449 U.S. 411, 417 (1981). To assess whether an officer had reasonable suspicion based on specific, articulable facts, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citing *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008).

The undersigned magistrate judge finds officers had at least reasonable suspicion to detain Defendant at the time he fled from TFO Jaworski. TFO Jaworski's suspicions were first aroused when he noticed a new suitcase in the luggage compartment, as he knows from his training that narcotics traffickers use new luggage to transport their contraband. Although this factor alone was insufficient to establish reasonable suspicion criminal activity was afoot, in combination with other factors, the new luggage can be significant. See *United States v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013) ("Even if a single factor identified by the district court, when viewed in isolation, did not support a finding of reasonable suspicion, our precedent prohibits such a fragmented approach to reasonable suspicion."). TFO Jaworski's suspicions were further raised after Defendant seemed nervous or confused about his travel plans, giving inconsistent locations as to where he was traveling from. TFO Jaworski noted Defendant had purchased a one way ticket at the last minute, which in his training and experience can also be consistent with an individual involved in criminal activity. TFO Jaworski also testified Defendant was traveling from a "source state" of Washington. And, after Defendant gave consent to search his suitcase, he ran away. See *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (holding unprovoked flight from police officers can raise suspicion of criminal activity). Considering all these factors together, the undersigned magistrate judge finds reasonable suspicion existed to detain Defendant at the time he was tackled by task force officers.

Finally, during Defendant's flight, TFO Jaworski discovered a handgun concealed inside the suitcase. This discovery provided probable cause to arrest Defendant, and task force officers were thereafter authorized to search his person and backpack incident to his arrest. See *United States v. Robinson*, 414 U.S. 218, 224, 235 (1973) (providing law enforcement may conduct a search of an arrestee's person and containers found on the arrestee's person incident to a warrantless arrest supported by probable cause).

11

In sum, TFO Jaworski's movement of Defendant's suitcase was not a seizure for Fourth Amendment purposes; TFO Jaworski's initial contact with Defendant was a consensual encounter; Defendant's consent to search the suitcase was valid; reasonable suspicion supported his subsequent detention; and discovery of the handgun in the suitcase provided probable cause to arrest Defendant and search his person and backpack he was wearing. Therefore, Defendant's motion to suppress evidence obtained from his suitcase, backpack, and person should be denied, as it was not obtained in violation of the Fourth Amendment. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress Statements and Request for Hearing (Filing No. 22) be denied.

Dated this 23rd day of December, 2022.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.