IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:22-CR-140 |
| vs. | |
| DONNALE C. CLAY, | MEMORANDUM AND ORDER ON OBJECTIONS TO FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS |
| Defendant. | |

## I.  INTRODUCTION

The Government has charged defendant Donnale C. Clay with possession with intent to distribute methamphetamine and felon in possession of a firearm. Filing 1 at 1–2. On August 12, 2022, Clay filed a Motion to Suppress Evidence and Statements, which argued that law enforcement officers seized evidence in violation of the Fourth Amendment and that statements he made to law enforcement should be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966). Filing 22. United States Magistrate Judge Michael D. Nelson held an evidentiary hearing for Clay's Motion and filed a Findings and Recommendation that recommended that Clay's Motion be denied. Filing 37. Clay timely objected to Judge Nelson's Findings and Recommendation on January 18, 2023. Filing 40. After reviewing the matter, the Court overrules Clay's objection, adopts Judge Nelson's Findings and Recommendation in its entirety, and denies Clay's Motion.

## II.  BACKGROUND

Judge Nelson's Findings and Recommendation thoroughly outlines the background for Clay's Motion, which the Court incorporates here by reference. Filing 37 at 1–4. The Court briefly outlines the background below to provide context for its ruling on Clay's objection.

1

In the morning of April 27, 2022, six Drug Enforcement Agency Task Force Group officers were interdicting at the Trailways Bus Station in Omaha, Nebraska. Filing 36 at 20. Two of the officers, Officer Nicholas Jaworski and Officer Christian Iten, were dressed in plain clothes with no weapons visible.[1] Filing 36 at 64–65.

When a bus arrives at the terminal, the doors to the luggage underneath the bus open. Filing 36 at 15. Although the bus terminal has a baggage handler, anyone in the general public has access to the luggage and may unload the luggage when the bus stops. Filing 36 at 15–16. Passengers on a bus arriving at the Omaha terminal must exit the bus for approximately 10 to 15 minutes. Filing 36 at 16–17. The baggage handler will remove luggage that needs to be transferred to a different bus, although on busier days the baggage handler will also remove bags that are not being transferred in order to reach bags that will be transferred. Filing 36 at 18–19.

While conducting interdiction, Officers Jaworski and Iten will look for luggage they deem to be suspicious from underneath the bus and remove it so that they can observe who retrieves it. Filing 36 at 20, 69. On April 27, 2022, Officer Jaworski saw a newer looking suitcase that had a plastic fastener still attached, as if the price tag was recently removed, with a tag showing St. Paul, Minnesota as the destination, the name "D. Clay," and a phone number. Filing 36 at 66. Officer Iten explained at the suppression hearing that, based on his training and experience, brand-new hard-sided bags are commonly used to transport narcotics. Filing 36 at 21.

Officer Jaworski removed the suitcase from the bus's luggage hold and placed it about three to five feet away because he believed it would be transferred to a different bus to reach its St. Paul destination and because he wanted to speak to the individual who retrieved the suitcase.

---

[1] There is no testimony about what the other officers wore, but based on the exhibits admitted at the hearing it appears that most, if not all, were also in plain clothes. Filing 40 at 2–5 (providing exhibits that show other officers dressed in plain clothes). In any event, this minor detail has no effect on the Court's analysis.

Filing 36 at 67–69. Clay approached the suitcase, prompting Officer Jaworski to walk toward Clay and ask if the suitcase was Clay's. Officer Jaworski presented his badge, identified himself as law enforcement, and assured Clay that he was not under arrest or in trouble. Filing 36 at 70–71. An exhibit admitted at the suppression hearing shows Officer Jaworski standing near the wall of the bus terminal while speaking with Clay, with Officer Iten standing a few feet away from Officer Jaworski next to the bus terminal's doors. Ex. 113; *see also* Filing 36 at 25–26, 102. Neither Officer Jaworski nor Officer Iten blocked Clay's path to the bus terminal or exit.

Officer Jaworski asked Clay about his travel plans. Filing 36 at 71. Clay first replied that he was coming from Minneapolis, but then stated he was traveling from Tacoma, Iowa. Filing 36 at 71. Officer Jaworski responded that Clay had not traveled through Iowa yet, and Clay then stated he was traveling from Tacoma, Washington. Filing 36 at 71–72. Officer Jaworski testified that Clay seemed confused or nervous, but he did not see any indication that Clay was intoxicated or using drugs. Filing 36 at 94–95.

Clay told Officer Jaworski that he was traveling to Minnesota to see family. Filing 36 at 72. Officer Jaworski asked Clay how long he would be Minnesota. Filing 36 at 72. Clay hesitated, looked away, and said "maybe seven days." Filing 36 at 72. When Officer Jaworski inquired if Clay had made return plans, Clay answered that he had not. Filing 36 at 72. Clay handed Officer Jaworski his bus ticket and itinerary, which showed that Clay's trip originated in Spokane, Washington and that he had a one-way ticket to St. Paul purchased two days prior. Filing 36 at 72–73. According to Officer Jaworski, Washington is a "source" state for drugs. Filing 36 at 81.

Officer Jaworski requested permission to search Clay's suitcase. Filing 36 at 73–74. Clay nodded yes, knelt down as if he was going to help Officer Jaworski unzip the bag, and then suddenly took off running. Filing 36 at 72–73. Officer Jaworski attempted to pursue Clay while

3

carrying the suitcase; however, the suitcase was partially unzipped and items began falling out. Filing 36 at 74. As Officer Jaworski picked up these items, he felt the outline of a handgun concealed in a soft cloth-like material. Filing 36 at 74–75. Other law enforcement officers tackled Clay. Filing 36 at 74. A subsequent search of the suitcase, a backpack worn by Clay, and Clay's person produced three handguns, methamphetamine, fentanyl pills, marijuana, and fake fentanyl pills. Filing 36 at 75.

### III.   ANALYSIS

#### A.  Standard of Review

28 U.S.C. § 636(b)(1) governs the different standards of review when a party objects to a pretrial decision or a proposed findings of fact and recommendations by a magistrate judge. *See* 28 U.S.C. § 636(b)(1). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . . . to which objection is made." *Id.*; *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) (When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections . . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is

4

acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally meaning 'as new.' Our review is independent and not premised on the district court's appropriate use of its discretion. We are concerned only with the proper application of the law . . . ."). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the undersigned has read the transcript of the suppression hearing as well as reviewed the exhibits admitted at the hearing.

### B. Clay's Objections

Judge Nelson analyzed four issues raised by Clay's Motion: (1) whether the removal of Clay's suitcase from the bus was an unlawful seizure; (2) whether Clay was unlawfully detained during his initial interaction with Officer Jaworski; (3) whether Clay gave valid consent to search his suitcase; and (4) whether Clay was unlawfully seized by law enforcement officers when he fled from Officer Jaworski. In his Findings and Recommendation, Judge Nelson resolved each issue in the Government's favor and recommended denying Clay's Motion. The Court addresses each issue in light of Clay's objections in turn.

1. *Unlawful Seizure of the Suitcase*

The Court begins with the issue of whether Officer Jaworski unlawfully seized Clay's suitcase when he removed it from underneath Clay's bus. Clay has filed no specific objections to

5

Magistrate Judge Nelson's conclusion that the suitcase was not seized, and that, therefore, no unlawful seizure occurred.[2] Filing 37 at 5–8.

Reviewing this issue *de novo*, the undersigned agrees with Judge Nelson's conclusion that no seizure of Clay's suitcase occurred. A seizure of private property occurs "when law enforcement 'meaningful[ly] interfere[s] with an individual's possessory interests in property[.]'" United States v. Green, 9 F.4th 682, 688 (8th Cir. 2021) (alterations in original) (quoting United States v. Va Lerie, 424 F.3d 694, 706 (8th Cir. 2005)). "[M]ere technical trespass to an individual's private property" does not constitute a seizure. *Id.* Three factors guide the application of the meaningful-interference standard: "(1) whether [detaining the package] delayed a passenger's travel or significantly impacted the passenger's freedom of movement; (2) whether it delayed the package's timely delivery; and (3) whether it deprived the carrier of custody of the item." *Id.* If one of these factors is satisfied, a seizure under the Fourth Amendment occurred. *See id.*

None of the factors are satisfied here. Officer Jaworski handled Clay's suitcase for a few seconds to place it mere feet from the bus. Nothing in the record shows that this slight handling of the suitcase delayed Clay's travel or the suitcase's timely delivery to him. Clay was already

---

[2] Clay does "object[] generally" to Judge Nelson's Findings and Recommendation. Filing 40 at 1. This is not the type of objection meriting *de novo* review of this issue. As the District of Minnesota has recognized, "Objections which are not specific but merely repeat arguments presented to and considered by a magistrate judge are not entitled to de novo review, but rather are reviewed for clear error." Montgomery v. Compass Airlines, LLC, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015); *see also* Martinez v. Astrue, No. CIV.A. 10-5863, 2011 WL 4974445, at *3 (E.D. Pa. Oct. 19, 2011) (citing cases from several jurisdictions for this proposition). The Eighth Circuit also seems to recognize this principle. *See* Belk v. Purkett, 15 F.3d 803, 815 (8th Cir. 1994) ("[T]he district court need not conduct de novo review when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations.") That being said, the Eighth Circuit has also "repeatedly emphasized" *de novo* review of a magistrate judge's findings and recommendations so that the district court retains "substantial control over the ultimate disposition of matters referred to a magistrate." Hudson v. Gammon, 46 F.3d 785, 786 (8th Cir. 1995) (quoting Belk, 15 F.3d at 815). Thus, Clay's failure to make a proper objection notwithstanding, the Court will conduct *de novo* review of the suitcase seizure issue. However, it deems any objections that Clay failed to properly raise waived. *See* Fed. R. Crim. P. 59(b)(2) ("Failure to object in accordance with this rule waives a party's right to review.").

required by the bus company to exit the bus and retrieve his suitcase so that he could transfer buses. Thus, the first two factors are clearly not satisfied.

The last factor requires further analysis. The Eighth Circuit has explained that whether law enforcement's interference with private property deprived the carrier of custody of the item depends on "whether the government's actions go beyond the scope of the passenger's reasonable expectations for how the passenger's luggage might be handled when in the carrier's custody." *Va Lerie*, 424 F.3d at 707. While how law enforcement handled a defendant's luggage is relevant, *see United States v. Zacher*, 465 F.3d 336, 339 (8th Cir. 2006), this inquiry "turns more on whose direction law enforcement followed, rather than where the package was briefly taken." *Green*, 9 F.4th at 689.

The undersigned agrees with Judge Nelson that the last factor is not satisfied. "[T]he case law is clear that a traveler's possessory interest in his luggage is an it zenith when the luggage is in his direct possession and is at its nadir when the luggage has been checked with a common carrier." *United States v. Hill*, 805 F.3d 935, 938 (10th Cir. 2015)*; see also Va Lerie*, 424 F.3d at 706 (stating that "a commercial bus passenger has less possessory interest in checked luggage than he has in carry-on luggage in his immediate possession"). In this case, Clay had surrendered his bag to the bus company's custody and had no ability to access it until the bus stopped. *Cf. Hill*, 805 F.3d at 938 (holding that the defendant's bag stored in a common luggage area was "intermediate between a bag in his direct possession and a bag checked with [the carrier]" and, because the defendant could "reasonably expect that he could access that bag" at any time, law enforcement taking the bag and rolling it down the aisle while questioning passengers "deviated significantly from a reasonable travelers' expectations" and deprived the defendant "of his possessory interest"). His possessory interest in his luggage was therefore coextensive with how

7

the bus company permits the treatment of luggage that is fully in its custody. *See Va Lerie*, 424 F.3d at 706 (noting that "a commercial bus passenger who checks his luggage should reasonably expect his luggage to endure a fair amount of handling," for instance, the luggage being "sorted, loaded, rearranged, possibly transferred to another bus, and unloaded"); *United States v. Ward*, 144 F.3d 1024, 1032 (7th Cir. 1998) (noting that a bus passenger who checked his luggage with the busy company "could have no reasonable expectation . . . that the bag would not be touched, handled, or even removed from the bus prior to the bag's arrival [at its destination]").

The testimony at the suppression hearing demonstrated that Clay had to exit the bus and retrieve his suitcase. During the deboarding process, luggage underneath the bus is accessible to and may be removed by the general public. As Officer Jaworski stated at the suppression hearing, passengers will occasionally remove other passenger's bags from the bus as they search for their luggage. The baggage handlers at the bus stop regularly handle luggage in the manner Officer Jaworski did. Because the evidence shows that many bags in the bus company's custody regularly end up being handled in the same manner and being placed in the same location as Clay's suitcase, Officer Jaworski did not deprive the bus company of its custody over Clay's suitcase. Officer Jaworski briefly handling the suitcase to remove it from the bus's luggage compartment and placing it a few feet beside the bus did not exceed the scope of how a reasonable passenger would expect his or her luggage to be handled while in the bus company's custody. *See Zacher*, 465 F.3d at 339 (holding that there was no seizure when a law enforcement officer took a package from FedEx employee and placed it on the floor with other packages because "a reasonable person could expect FedEx to handle his or her package the same way"); *United States v. Ward*, 144 F.3d 1024, 1032 (7th Cir. 1998) (holding that there was no seizure when a law enforcement officer removed the defendant's luggage from a bus's luggage compartment because the defendant "could

reasonably have foreseen that the bag would be handled, moved around, and even taken off the bus, whether at intermediate stops when the driver might need to remove the bag to sort and/or gain access to other luggage, or at a hub . . . where the bag would have been transferred to another bus"). Therefore, no seizure of Clay's suitcase occurred.

This case is different from *United States v. Alvarez-Manzo*, in which the Eighth Circuit held that law enforcement seized a bag by removing it from the bus's cargo area and taking it to the bus's passenger seating area to locate the owner. 570 F.3d 1075–77 (8th Cir. 2009). In distinguishing the case from the Eighth Circuit's prior holding in *Va Lerie*—which held that no seizure occurred when law enforcement removed luggage from the bus's luggage compartment to a room at the terminal at the bus company's request, *Va Lerie*, 424 F.3d at 708–09—the *Alvarez-Manzo* court emphasized that law enforcement did not take the bag to the passenger area at the bus company's direction. *Alvarez-Manzo*, 570 F.3d at 1076. The court found it important that the law enforcement officer "was directing the action with respect to [the defendant's] bag." *Id.* In the present case, the bus company routinely permits the luggage in its custody to be handled in the exact way Officer Jaworski did. Officer Jaworski was not acting contrary to the direction of the bus company or beyond the scope of how it permits luggage in its custody to be treated, unlike the situation in *Alvarez-Manzo*. *See Va Lerie*, 424 F.3d at 702 (interpreting the Supreme Court's decision in *United States v. Jacobsen*, 466 U.S. 109 (1984), as holding that when law enforcement exerted "dominion and control" over a package "in contravention to [the carrier's] custody of the package" a seizure occurred). Judge Nelson correctly concluded that no seizure occurred because none of the *Va Lerie* factors were satisfied.

   2. *Unlawful Seizure of Clay During Initial Encounter*

Clay objects to Judge Nelson's conclusion that Officer Jaworski's encounter with him after he exited the bus was not an unlawful seizure. Filing 40 at 1–7. Along with his objection to Judge Nelson's legal conclusion, Clay also objects to Judge Nelson's finding that Officer Jaworski did not block Clay's path to the bus terminal or exit, that other task force officers were not in close proximity to Clay, and that law enforcement did not restrain Clay's liberty or block his path. Filing 40 at 1–7.

"Consensual encounters between law enforcement officers and citizens that do not involve coercion or restraint are not seizures." *Oglesby v. Lesan*, 929 F.3d 526, 532 (8th Cir. 2019). A law enforcement officer does not effectuate an unlawful seizure "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Lillich*, 6 F.4th 869, 875 (8th Cir. 2021) (quoting *United States v. Drayton*, 536 U.S. 194, 200, 122 (2002)). "To determine whether a police-citizen encounter is consensual or implicates Fourth Amendment protections, [courts] must 'consider[] the totality of the circumstances' and 'the unique facts of each case.'" *Id.* at 876 (second alteration in original) (quoting *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012)). The Eighth Circuit has delineated several factors relevant to this analysis:

> [O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*Id.* (quoting *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008)). Ultimately, "The test for whether a person has been 'seized' within the meaning of the Fourth Amendment is an 'objective standard' that looks to whether a reasonable person would have believed that he was not free to

10

leave." *United States v. Grant*, 696 F.3d 780, 784–85 (8th Cir. 2012) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)).

First, the Court agrees with Judge Nelson's findings. Officer Jaworski's position relative to Clay's did not prevent Clay from proceeding to the bus terminal or the exit. While law enforcement officers were in the vicinity, none were in close proximity to Clay or would otherwise prevent Clay from leaving. No officer restricted Clay's ability to simply walk away from Officer Jaworski if Clay wanted to do so.

The Court further agrees with Judge Nelson's conclusion that Officer Jaworski's interaction with Clay did not constitute a seizure under the Fourth Amendment. Officer Jaworski was dressed in plain clothes and never revealed a weapon. His questions were conversational and nonthreatening.[3] He told Clay that he was not in trouble or under arrest. Under these circumstances, a reasonable person would have felt free to leave. Therefore, Officer Jaworski's interaction with Clay was a consensual encounter and not a seizure. *See Drayton*, 536 U.S. at 203–04 (holding that the police did not seize the defendants when officers boarded a bus and began question passengers because the officer who approached the defendants did not brandish a weapon or make intimidating movements, left the aisle free so that the defendants could exit, and spoke to passengers in a polite and quiet voice).

3. Consent to Search Suitcase

Clay objects to Judge Nelson's conclusion that Clay consented to Officer Jaworski searching Clay's suitcase. Filing 40 at 8. Clay further objects to findings Judge Nelson made in support of this conclusion, which include that Officer Jaworski "did not make any promises or misrepresentations" to Clay and that there was "no indication [Clay] was intoxicated or using

---

[3] The Court has reviewed the bodycam footage admitted at the hearing, which shows that Officer Jaworski spoke to Clay in a pleasant and nonconfrontational tone.

11

drugs." Filing 37 at 3, 10; Filing 40 at 8–9. Clay emphasizes that roughly twelve hours after his arrest he tested positive for benzodiazepines, cannabinoids, opiates, and oxycodone. Filing 40 at 8–9. He also points out that officers failed to tell Clay that he could refuse consent—which is relevant to whether consent is valid—and that Officer Jaworski "misrepresented" his role at the bus terminal by comparing himself to a Transportation Security Administration (TSA) worker. Filing 40 at 8–9.

"[A] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Alloway*, 25 F.4th 1093, 1096 (8th Cir. 2022) (quoting *United States v. Garcia-Garcia*, 957 F.3d 887, 892 (8th Cir. 2020)). "The question is not whether the defendant subjectively meant to consent, but whether [his] conduct would cause a reasonable person to believe [he] consented to the search." *Id.* Courts analyze the voluntariness of consent by examining the totality of the circumstances while considering the following factors:

> The defendant's age, education, intelligence, sobriety, and experience with the law; and context, such as the length of questioning, the substance of any discussion preceding the consent, whether the defendant was free to leave, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Garcia-Garcia*, 957 F.3d at 896–97 (cleaned up) (quoting *United States v. Correa*, 641 F.3d 961, 966-67 (8th Cir. 2011)). The Eighth Circuit groups these factors into three categories: "(1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time he gave his consent." *Id.*

Looking at the totality of the circumstances, the Court agrees with Judge Nelson that Clay gave knowing and voluntary consent to Officer Jaworski to search his suitcase. As previously noted in this Order, the interaction between Officer Jaworski and Clay occurred in a public area

and was conversational and nonthreatening. Officer Jaworski did not display a weapon or otherwise attempt to intimidate Clay. Clay is 38 years old and has interacted with law enforcement and the criminal justice system frequently in the past. Clay's response to Officer Jaworski's request to search the backpack was consistent with someone giving voluntary consent.

In arguing against this conclusion, Clay asserts that the fact he tested positive for a combination of drugs twelve hours later shows that Officer Jaworski should have realized Clay could not give consent. The Court disagrees. As an initial matter, the test was performed about twelve hours after Clay's arrest and after he was admitted to a hospital to treat his broken leg. Clay fails to address the possibility that some of the drugs in his system resulted from medical treatment, such as to alleviate pain, which would have occurred after he spoke with Officer Jaworski. Additionally, even if Clay had used drugs prior to his interaction with Officer Jaworski, there is no evidence that Officer Jaworski was aware of this. *See Alloway*, 25 F.4th at 1096 (emphasizing that the inquiry is whether a defendant's conduct would cause a reasonable person to believe that the defendant consented to a search). The bodycam footage of the interaction between Clay and Officer Jaworski shows that Clay spoke in a clear voice, did not have slurred speech, and exhibited no signs of intoxication.

Clay also highlights that Officer Jaworski never informed Clay that he could refuse to give consent. But as Clay himself recognizes, being informed of the right to refuse consent is only relevant to, not dispositive of, whether Clay gave voluntary consent. *See United States v. Flores*, 474 F.3d 1100, 1105 (8th Cir. 2007) ("The fact that [the defendant] was never informed of his right to withhold consent . . . [is] not determinative of the [consent-to-search] issue."). Finally, while Clay objects to Judge Nelson's finding that Officer Jaworski made no misrepresentations to Clay, even if Officer Jaworski comparing his role to the TSA constitutes a misrepresentation, there

is no evidence that Clay relied upon this representation in giving consent. *See United States v. Urbina*, 431 F.3d 305, 309 (8th Cir. 2005) (outlining that whether the defendant "*relied* upon promises or misrepresentations made by the police" is a factor used to "examin[e] the environment in which consent was given") (emphasis added).

    4. Seizure After Clay's Flight

Clay last objects to Judge Nelson's conclusion that officers had reasonable suspicion to detain Clay when he suddenly fled from Officer Jaworski. Clay argues that Officer Jaworski and Officer Iten relied on a "litany of unproven, oft-cited interdiction hunch facts"—such as Clay having a one-way ticket and traveling from a "source" state for drugs—to support their reasonable suspicion to have Clay detained. Filing 40 at 9–10. He further asserts that the discovery of the firearms in the suitcase could not have provided reasonable suspicion for his detention, because the firearms were discovered after he was tackled by law enforcement officers. Filing 40 at 12–13.

A law enforcement officer "can stop and detain a suspect without a warrant, if the officer has reasonable suspicion, supported by articulable facts, that criminal activity 'may be afoot.'" *United States v. Castro-Gaxiola*, 479 F.3d 579, 583 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion is "obviously less demanding than . . . probable cause." *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In determining whether reasonable suspicion exists, courts "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Clinton v. Garrett*, 49 F.4th 1132, 1140 (8th Cir. 2022) (internal quotation marks omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). This analysis considers "what the officer reasonably knew at the time" without the benefit of hindsight. *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (quoting *United States v.*

*Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). "In considering the totality to the circumstances, [courts] 'may not view individual elements of suspicion in isolation,' but rather '[courts] must view the individual elements in context, *i.e.*, in light of one another, and give "due weight" to the officer's inferences when assessing the overall level of suspicion.'" *Id.* at 629–30 (quoting *United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020)).

Officer Jaworski testified that he first approached Clay because Clay retrieved the new hard-sided suitcase Officer Jaworski had placed beside the bus. According to Officer Jaworski, in his experience, drug traffickers use new hard-sided luggage to transport narcotics. Officer Jaworski became more suspicious after speaking with Clay about Clay's travel plans. Clay gave inconsistent statements about where his travel started and shifted his answers after Officer Jaworski noted that his explanation for his travel did not make sense. Filing 36 at 71–72; *see United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) ("We [have] held that nervousness and inconsistent answers to questions were enough for reasonable suspicion."). Officer Jaworski further testified at trial that Clay seemed confused or nervous. *See United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (noting, in holding there was reasonable suspicion, that the defendant acted nervously and had "difficulty in answering basic questions about his itinerary"). Officer Jaworski also explained that his suspicions were heightened after viewing Clay's bus ticket and itinerary, which showed that Clay had purchased a one-way bus ticket two days earlier, because in his experience it was consistent with an individual involved in criminal activity. While many innocent people may purchase one-way bus tickets shortly before travel—a point Clay emphasizes—a determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct." *Sanchez*, 955 F.3d at 675 (quoting *Arizu*, 534 U.S. at 277); *see also Castro-Gaxiola*, 479 F.3d at 583 ("Even a combination of innocent conduct can provide reasonable suspicion of criminal activity.").

Most significantly, however, after Clay consented to Officer Jaworski searching the suitcase, he suddenly bolted. As the Government correctly asserted in its brief opposing Clay's Motion to Suppress, "The rational inference of someone running away after granting consent to search a suitcase is that the person does not want to be held legally responsible for the contents that would be found during the search." Filing 26 at 15. Officer Jaworski could rely on this reasonable inference, along with all the other suspicious facts, to ask his fellow officers to detain Clay. *See United States v. Daniel*, 887 F.3d 350, 354 (8th Cir. 2018) (noting that "due weight should be given" to an officer's "specific reasonable inferences which he is entitled to draw from the facts in light of his experience") (quoting *Arvizu*, 534 U.S. at 27). Thus, the combination of Clay's new hard-sided suitcase, his nervous and confused conduct, his inconsistent answers about his travel, his recent purchase of a one-way bus ticket, and his sudden flight after giving consent to search his suitcase provided Officer Jaworski with more than enough reasonable suspicion to justify detaining Clay.[4]

5. *Suppression of Clay's Statements*

Finally, Clay objects that Judge Nelson considered the issue of suppressing Clay's statements after being tackled moot upon the government representing that it would not seek to introduce these statements at trial. Clay argues that Judge Nelson should have ruled that the statements are not admissible given that the Government stipulated that these statements should not be admitted at trial. The Court agrees with Judge Nelson that the Government's representation moots this issue.

---

[4] Clay also objects that Judge Nelson concluded that officers had probable cause to arrest Clay and then search his backpack incident to the arrest. Filing 40 at 12–13. Clay never asserted that officers lacked probable cause, instead grounding his Motion to Suppress on his belief that the officers lacked reasonable suspicion to detain him. Filing 22 at 1–2 (outlining Clay's objections and stating that the search of Clay's backpack was "the fruit of his unlawful detentions—the original one and the subsequent—and the unlawful search of the suitcase"). In any event, the Court agrees with Judge Nelson's conclusion.

## IV. CONCLUSION

The Court agrees with the findings and conclusions reached by Judge Nelson. Accordingly,

IT IS ORDERED:

1. Clay's Objection, Filing 40, is overruled;

2. Judge Nelson's Findings and Recommendation, Filing 37, is adopted in its entirety; and

3. Clay's Motion to Suppress, Filing 22, is denied.

Dated this 16th day of February, 2023.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge